IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DOUGLAS MARTIN DAVIS,        )
                                         )
        Petitioner,          )
                                         )      NO. 3:18-cv-01232
v.                                 )
                                       )      JUDGE RICHARDSON
UNITED STATES OF AMERICA,   )
                                         )
        Respondent.     )

## <u>MEMORANDUM OPINION</u>

Petitioner filed a Motion to Vacate, Set Aside, or Correct Sentence in accordance with 28 U.S.C. § 2255. (Doc. No. 1.) For the reasons stated herein, Petitioner's Motion will be **DENIED**, and this action will be **DISMISSED**.

## FACTUAL BACKGROUND

On February 4, 2015, a federal grand jury indicted Petitioner Douglas Martin Davis in Case No. 3:15-cr-00015, with kidnapping for sexual exploitation, abuse, and assault, in violation of 18 U.S.C. § 1201(a)(1) (Count One); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count Two); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Three); and using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Four). (R. 1.)[1] On January 28, 2016, Petitioner entered an open plea of guilty, before now-former Judge Kevin H. Sharp, to all counts of the Indictment. (R. 20-21, 44.)

At the plea hearing, Petitioner testified, under oath, that his counsel had gone over with him

---

[1] References below to "R." are to the docket numbers in the underlying criminal case, No. 3:15-cr-00015, over which the undersigned did not preside at any point.

the charges, the elements of the offense, and what the government would have to prove if his case went to trial. (R. 44 at 6-9.) Petitioner also testified that he was satisfied with his counsel's representation and investigation into the charges and that he was freely pleading guilty because he was, in fact, guilty and not because anyone had threatened him, coerced him, or promised him anything. (*Id*. at 9-10.) The Court advised Petitioner that the maximum term of imprisonment on Count One was life and on Counts Two and Three was ten years; the Court further advised Petitioner that on Count Four there was a minimum term of imprisonment of seven years and a maximum term of life, to run consecutively with the other counts. (*Id*. at 10.) The Court then had the following colloquy:

> THE COURT: You understand that your sentence will ultimately be determined by a combination of the advisory sentencing guidelines and any possible authorized departures or variances from those guidelines weighing the statutory factors?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: You talked to [your counsel] about how the guidelines might apply in your case?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. You understand the Court won't be able to -- will not be able to determine your advisory guideline range until the Pre-Sentence Report is completed, and you and your lawyer have had a chance to object to those, any particular parts of the PSR that you'd like to –
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. You understand that, once that guideline range is determined, that I'm authorized to depart and vary upward or downward from that range?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: So you know that your sentence could ultimately be higher or lower than the guideline sentence or any sentence that you and your lawyer may have talked about?

THE DEFENDANT: Yes, sir.

THE COURT: You understand any possible sentence that you've talked about with your lawyer or with the government lawyers, those are just predictions or estimates; they're not guarantees of anything?

THE DEFENDANT: Yes, sir.

(*Id*. at 11-12.)

To establish the facts that formed the bases of the charges, the Government called FBI Agent

Ric Fagan to testify. Agent Fagan testified as follows:

THE WITNESS: Defendant was friends with victims 1 and 2. On October 2nd, 2014, the defendant had been feeling depressed and victims 1 and 2 were trying to cheer him up. At some point while the three were visiting at victim 2's residence, the defendant produced a semi-automatic handgun and threatened victim 1. The defendant directed victim 2 to the floor and told victim 1 to secure victim 2's hands and feet with duct tape. The defendant stated that he had already killed his girlfriend. The defendant then forced victim 1 to help him drag victim 2 to the bathroom. Victim 2 later escaped and walked to his place of employment, where he called his father, and his father contacted the police. The defendant forced victim 1 to perform oral sex with him. While victim 1 was performing oral sex, the defendant struck her in the face with his fist and told her she was not doing it right. The defendant continued to rape victim 1 vaginally and anally.

After the rape, the defendant stole $50 from victim 2's wallet and assaulted victim 2, and the defendant directed victim 1 to unload victim 2's vehicle, a gold 1998 Toyota Camry, and the defendant and victim 1 left in victim 2's vehicle with victim 2 still secured in the bathroom. They traveled to Carthage, Tennessee, where the defendant stopped to get fuel.

The defendant then drove the vehicle into Kentucky where they stopped on Happy Hollow Road in Hardin County, Kentucky and abandoned the vehicle. The defendant took victim 2 into a wooded area and raped victim 1 an estimated three times, once in Bullitt County Kentucky, and once in an unknown location. Law enforcement was able to locate the defendant and victim 1 on October 4th by pinging the defendant's cell phone. They located the two sitting on the ground behind a dumpster at a Pilot Gas Station in Lebanon Junction, Kentucky, which is in Bullitt County.

After his capture on October 4th, the defendant was advised of his Miranda rights and confessed his actions to law enforcement. The defendant stated that he had been in love with victim 1 since he had met her. He stated that he had planned to let her

go and then commit suicide. The firearm was the primary instrumentality [sic] used to coerce the victims into compliance with the defendant's orders.

The firearm, a Phoenix Arms 25 semi-automatic, was recovered at the scene in loaded condition. And the firearm was not manufactured in Tennessee and was, thus, shipped in interstate or foreign commerce at some point. The defendant was convicted of felony burglary in Florida and sentenced to two years' confinement.

(*Id*. at 15-17.)

Following Agent Fagan's testimony, Petitioner admitted to the truth of the facts as described by Agent Fagan and that he was guilty of the charges filed against him. (*Id*. at 17-18.) Petitioner testified that he did not have any reservations about pleading guilty. (*Id*. at 19.)

The United States Probation Office subsequently prepared a Presentence Investigation Report ("PSR")[2] in Petitioner's case, using the monikers "Victim A" and "Victim B" instead of "Victim 1" and "Victim 2," respectively. The facts in the PSR, relevant to Petitioner's motion to vacate, reflected that on October 8, 2014, four days after Petitioner's arrest, officers from the Cumberland County Sheriff's Department questioned Victim A about her kidnapping. (R. 43, at ¶¶ 7, 10.) Victim A recounted that while at their residence Petitioner forced her at gunpoint to bind her boyfriend, Victim B, with duct tape and then locked Victim B in the bathroom (*Id*. at ¶ 10.) Petitioner subsequently sexually and physically assaulted Victim A, took $50 or $70 from Victim B, and left the residence with Victim A in Victim B's 1998 Toyota Camry. (*Id*. at ¶¶ 10-13.) Petitioner drove Victim A throughout Tennessee and Kentucky, sexually assaulting her at various points. (*Id*. at ¶¶ 13-14.) At one point, Petitioner made Victim A camp with him in Elizabethtown, Kentucky. (*Id*. at ¶ 14.) Petitioner told Victim A that he had been planning this crime for three months and that he "'had been in love with [her] for a while.'" (*Id*.) Petitioner told Victim A that

---

[2]The PSR has not been unsealed in this case, and the very limited references herein to the PSR are not intended to have the effect of unsealing the PSR with respect to any information not specifically referenced herein.

he (Petitioner) "'could not support' his children, that his older brother molested him, that he (Petitioner) had molested his daughter, and that he could not go back to prison." (*Id*.) Petitioner stated that he wanted Victim A to write his "life story" before he killed himself. (*Id*.) Petitioner wanted Victim A to transcribe his "life story" as he dictated it, and told her that once she finished her transcription, he would allow her to leave. (*Id*.) The following are excerpts from Petitioner's dictated life story:

*The World as I See It-Douglas Davis*

I think it was age 3, maybe 4, when my older brother started to molest me. At that age, you think it's a game. A painful game, but a game, nonetheless. By age 7, it became routine. I shared a room with [name omitted]. He was the monster under the bed. My brother was 4 years older than me, so if I said no, he would beat me. He'd been blacking my eye so severely that I couldn't see out of it. I wanted to tell my mom; I wanted to tell the neighbor; but I knew, I was so sure, that the monster under my bed would get me. [Name omitted] would smack me in the face if I wasn't doing it right. One time I can remember him throwing me down the stairs, because I threatened to tell Mom. And yet, for some reason, I still loved the monster under my bed. So I did what every extremely abused child does-I abuse. It's like eating, or breathing.

As you know, Daddy has done a lot of bad things to you. Unforgiveable things that can never be taken back. I never wanted to hurt you. I'm glad that you told your mother. That must have taken a lot of courage to tell on your daddy. Who you love and look to protect you, when you were a baby, you were so tiny, and I promised you I would protect you. I just couldn't protect you from me. I know my death is going to hurt you but Daddy finally gets to keep that promise. I hope someday when you fully understand what Daddy has done, you can find it in your heart to forgive me. Not that I am worthy of your forgiveness. Your education is very important. Drugs are bad. Good education-you won't have to struggle you can never rely on a man to support you. You must stand on your own two feet. Please stop your stealing. This is not your fault, [REDACTED]. You did nothing wrong.

You can't fight the urge to do it. It's like falling into deep water. You're running out of breath, you're not to the top, you feel like

you're drowning, that urge to breath; that need to breathe. That's how it feels. I have lost the battle to stop that urge. On many occasions, on other children; boys and girls. Mostly childhood friends. At 13 or 14, I was making my own, older friends. So I didn't abuse for a long time. Instead I started abusing drugs. It kept my demons at bay. My mom was never there. She worked and provided for the family. But other than that she was never there. I don't blame my mother. I have tried to teach my children right from wrong. I've tried to teach them to love one another, and to be respectful young children. I've always tried to be a good father; I've always tried to be there for them and support them.

I have a lot of pain in my hands and in my feet, and no one believes me; the doctors, Angie, and I'm tired of living with the pain. I cannot support my children the way they deserve to be supported. I am doing this so that my children will have a guaranteed income until they are old enough to fend for themselves. I have given them all the knowledge to succeed in life. I hope that someday, they will understand that I am dying because I cannot support them. I've hurt [REDCATED] the deepest. She will need help so that she doesn't fall into the stereotype little girl that's been abused. I am very sorry for all the pain I've caused everyone in my life. I am a hypocrite. I have said for years that anyone who could hurt their little girl should be shot. So, I guess I'm not a hypocrite. I love you all and I hope someday you can forgive me for hurting my little girl.

(*Id*.) Petitioner also had Victim A transcribe letters. In three letters—to one of his children, to all of

his children, and to fathers generally, respectively—he dictated the following in pertinent part:

I know in the beginning, you won't understand. Know that Daddy could not support you in the way you should be supported. For what I did to [REDACTED], would send me to prison for too long. You guys would be all grown up by the time I got out, except Daddy would have no way of helping.

. . .

I love you all, I'm sorry that I am a coward and that I am too weak to face my daughter, my mother, but I don't look at it like that. I look at it as a man that would do anything for his children. It just so happens that this is the only way I can do it. So coward? Yeah I'll be your fucking coward. But I'm man enough to stand up and right my wrongs.

I love you all. I take full responsibility I am not trying to say that demons did this or that Satan made me do it. I'm just a product of my environment.

. . .

I know this may not reach a lot of people. If it gets put on Facebook, then maybe my tragedy can help yours. Our daughters love us, they look up to us. To them, you are Super Man. You can do no wrong in their young eyes. I'm not asking or suggesting that anyone should kill themselves, but if you don't have enough respect for that little girl, for yourself, at least take yourself away from her. It's not "Daddy's Little Secret." You are robbing your Princess, your little girl, the one you held as an infant, you would protect her at all costs, but you have to look in the minor and ask yourself, "Who's protecting that little girl from you?" Only you can stop the abuse.

(*Id.* at ¶ 15.)

The two left the campsite and hitchhiked to a truck stop, where Petitioner informed Victim A that he had turned his cellphone back on so that the "police could find" them. (*Id*. at ¶¶ 16-18.) Petitioner subsequently raped Victim A in a rented shower at the truck stop, and the two of them then waited for the police to arrive. (*Id*. at ¶ 19.) Victim A stated that Davis told her that the kidnapping and sexual assaults "meant something" to him and that "it was special because [he] had feelings" for her. (*Id*. at ¶ 20.) Victim A also advised officers that Petitioner admitted to sexually assaulting his daughter to her. (*Id*.)

Following Victim A's interview, officers interviewed Petitioner on October 8, 2014. (*Id*. at ¶ 21.) In that interview, Petitioner admitted to sexually assaulting Victim A multiple times. (*Id*.) Petitioner also admitted to sexually abusing his seven-year-old daughter. (*Id*. at ¶¶ 22-23.) Petitioner further admitted to sexually abusing other children when he was also a child. (*Id*. at ¶ 24.) Petitioner estimated that he was eight or nine years old when he began sexually abusing approximately twenty

victims. (*Id.*)

The PSR also provided a section regarding Petitioner's personal history. According to the
PSR, Petitioner's parents divorced when he was an infant, and Petitioner was primarily raised by
his mother. (*Id.* at ¶ 62.) The PSR also reported the following:

> The defendant described his childhood as "pretty rough" and stated that he was
> "raised around bikers." According to the defendant, his mother "did the best she
> could" but she did not "know the babysitters weren't good." The defendant reported
> that his babysitters "ran around naked" and exposed him and his siblings to drug use
> at a young age. The defendant reported that he did not attend school "much" as a
> child because he "hated it."
>
> The defendant reported that he was sexually abused by his brother, who was four
> years older, from age 4 until age 12. According to the defendant, his brother "got
> aggressive" as he got older and that his brother would "beat him" when he did
> something wrong (sexually). The defendant reported that he was also sexually abused
> by his father when he was 6 years old. According to the defendant, his father also
> molested his brother and sister. The defendant reported that his father tried to molest
> him when he got older, but the defendant would "make a scene," and he would stop.
> According to the defendant, his father had sexual relations with the defendant's sister
> until she was in her 30s. The defendant reported that his sister reported the abuse to
> their mother, and their mother contacted the police.
>
> . . .
>
> The defendant reported that he first consumed alcohol when he was 8 years old (1978)
> and consumed i[t] approximately twice per week from age 13 (1983) until the late
> 1990s. The defendant reported that he first used marijuana when he was 8 years old
> and used it daily until his arrest for the instant offense (2014). According to the
> defendant, he first used powder cocaine and crack cocaine when he was 9 years old
> (1979). The defendant used powder cocaine daily and crack cocaine every other day
> until 1988. The defendant reported that he used methamphetamine twice when he
> was in late 20s. The defendant reported that he used heroin "off and on"
> approximately 10 to 15 times from age 27 until age 29. According to the defendant,
> he abused prescription medications (hydrocodone, Percocet, Lortab, and oxycodone)
> from 2006/2007 until his arrest for the instant offense.

(*Id.* at ¶¶ 63-64, 73.)

For purposes of the United States Sentencing Guidelines, the total offense level on Counts

One through Three, adjusted for enhancements and acceptance of responsibility, was 35. (*Id.* at ¶¶ 34-44.) Count Four carried a mandatory, 84-month sentence to run consecutively to the sentence on Counts One through Three. (*Id.* at ¶45.) Because most of Petitioner's prior convictions did not count toward his criminal-history computation, his criminal history category was deemed I. (*Id.* at ¶¶ 47-53.) As a result of these factors, Petitioner's pre-departure range was 252 to 294 months of imprisonment. (*Id.* at ¶86.) The Probation Office recommended imprisonment for a term of 324 months. (*Id.* at 24.) The Probation Office suggested two ways of getting from the pre-departure guideline ranged (topped out at 294 months) to the recommended sentence of 324 months. The first was an upward departure based on the following factors, which might warrant an upward departure:

> (a)  Pursuant to U.S.S.G. § 4Al.3(a)(l), if reliable information indicates that the defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, an upward departure may be warranted. In a statement to officers and in his "life story," the defendant made admissions regarding prior conduct involving sexual assaults. The defendant also admitted that he "lost the battle to stop [the] urge" to sexually abusing others.

> (b)  Pursuant to U.S.S.G. § 4Al. 3(a)(2)(E), prior similar adult criminal conduct not resulting in a criminal conviction may be a basis for an upward departure. During the commission of the instant offense and in a statement to officers, the defendant admitted to sexually assaulting his daughter, as well as other children.

(*Id.* at ¶ 100.) Alternatively, the Probation Office implied that the recommended sentence be based upon an upward variance from the pre-departure guideline range pursuant to 18 U.S.C. § 3553(a). (*Id.* at ¶ 101.)

On June 7, 2016, Petitioner's counsel filed a sentencing memorandum that objected to the Probation Office's recommended sentence and requested a sentence of 264 months of imprisonment, which represented the middle of the guideline range. (R. 28 at 1.) Petitioner's counsel based his

request, in part, upon a forensic psychologist's report detailing the sexual abuse that Petitioner suffered as a child. (R. 28 at 2-3; R. 30.) Petitioner's counsel also stated that he "vehemently object[ed]" to the use of Petitioner's uncorroborated statements in the PSR, regarding his sexual abuse of his daughter and other children, to support a significant increase in his sentence. (R. 28 at 2.)

On June 27, 2016, the Government filed its sentencing memorandum, requesting the Court to impose a life sentence.[3] (R. 37 at 1.) The Government asserted that an upward departure and/or upward variance to support a life sentence was warranted because of the horrific nature of the crime, Petitioner's extensive history of sexual assault and long criminal history (which, according to the Government were not adequately reflected in his guideline range), and the need to protect the public. (*Id*. at 2, 4, 8.) The Government cited, among other things, Petitioner's "life story," where he admitted to sexually assaulting "'other children[,] boys and girls' 'on many occasions.'" (*Id*. at 2.)

On June 29, 2016, Petitioner's counsel filed a response, arguing therein that the non-counting of Petitioner's burglary and theft convictions when he was 19 years old did not result in an underrepresentation of his criminal history, as those convictions were not similar to his charged offenses. (R. 38 at 2.) Petitioner's counsel also argued that any uncharged sex offenses, even if similar to the instant conduct, were not supported by any detailed, dated, or reliable evidence; that the bulk of the prior uncharged sexual misconduct allegedly occurred when Petitioner was a

---

[3] Oddly, the Government did not ask for a life sentence on any count. Instead, the Government requested a sentence of 240 months on Count One, 120 months on Counts Two and Three to run concurrent with Count One, and a sentence of 120 months on Count Four, to run consecutively to Counts One, Two, and Three. (*Id*., Doc. No. 37 at 1.) Despite its respective requests on the individual counts, there is no question that the Government therein paradoxically requested a life sentence. *United States v. Davis*, 702 F. App'x 247, 249 (6th Cir. 2017) ("The government filed its own sentencing memorandum that recommended a life sentence.") The request for life imprisonment must have been made with respect to Count Four, the only count for which the statutory maximum sentence was that high; thus, it is unclear why the Government indicated that it was seeking only a 120-month sentence on that count.

juvenile and should therefore not be considered; and that Petitioner was not given sufficient notice for such a drastic sentence two days prior the date set for sentencing. (*Id*. at 2-4.)

On June 30, 2016, Judge Sharp conducted Petitioner's sentencing hearing, at which he heard argument from the parties regarding the propriety of an upward departure and/or variance to life imprisonment. (R. 39; R. 45 at 6-15.) Petitioner's counsel again objected to the Government's request for a life sentence, arguing, in part, that such an upward departure and/or variance would be inappropriate because there was no additional evidence supporting Petitioner's uncorroborated statements about conduct with which he was never charged and because he was not given adequate notice of the Government's request for life imprisonment. (R. 45 at 9, 12- 13.) Petitioner's counsel objected to the lack of notice stating, "I was on notice of a 324-month sentence . . . that the probation office recommended. I was on notice of that, and I responded to that. Mr. Davis knew about that. Mr. Davis didn't know about this request for a life sentence until today." (*Id*. at 12.) The Court ultimately concluded to grant an upward departure, stating:

> Well, I -- I'm not sure that I have never granted an upward departure before, but it's warranted here for the reasons that are -- the standard that's required under 4A1.3, the significant reliability of his own statements made over a period of time that he never, to this day, has -- has disavowed. I think that his criminal history is underrepresented, and the likelihood that he'll commit these similar offenses again is high.
>
> So the upward departure is going to be granted. The extent to which I go up I don't know. I'm going to talk about 3553 factors.

(*Id*. at 16.)

After Petitioner's allocution and final argument from the parties, the Court sentenced Petitioner to 240 months of imprisonment on Count One, 120 months on Counts Two and Three, and 84 months on Count Four, with each term of imprisonment to run consecutively to each other, for an effective sentence of 564 months of imprisonment. (*Id*. at 23.) In reaching its decision, the Court

explained:

> Looking at the circumstances, the nature and circumstances of this offense and his criminal history and character, the premeditation of it, he is a predator. He does not need to be on the streets. I need to impose a sentence that reflects the seriousness of what he did. And the victims are alive physically, but they are damaged beyond repair, and you did that.
>
> There's a need to promote a respect for the law. He has none for the law or himself or anybody else. There's a need to provide a just punishment, deter others from--who might even think about engaging in this kind of conduct and, most importantly, protect the public from any further criminal activity from this man.

(*Id*. at 22-23.) As the Sixth Circuit later noted,[4] this sentence actually reflected both an upward departure and a subsequent upward variance, even though the Court was not crystal clear about this. When asked whether the parties had any objections to the sentence, Petitioner's counsel responded that "[p]ursuant to *Bostic*, Mr. Davis objects based upon notice and upward departure." (*Id*. at 25.)

Petitioner's counsel timely appealed the procedural and substantive reasonableness of Petitioner's sentence, which was affirmed by the Sixth Circuit on July 13, 2017. *See United States Davis*, 702 F. App'x 247 (6th Cir. 2017). Although finding that Petitioner's counsel's objection, "based upon . . . upward departure," was too vague to advise the district court that counsel was objecting to the adequacy of the district court's explanation, the Sixth Circuit nevertheless reviewed the procedural reasonableness of Petitioner's sentence under the plain-error standard, and found no plain error. *Id*. at 251-54. In so doing, the court rejected all of Petitioner's various challenges to procedural reasonableness: that the district court inadequately explained the sentence imposed; that the imposition of consecutive sentences was improper; that Petitioner's criminal history was sufficiently represented by the original guideline calculation; that his sentence should be mitigated

---

[4] *See Davis*, 702 F. App'x at 253.

based upon his horrific upbringing; and that the district court's Statement of Reasons for imposing a sentence outside of the guideline range was inadequate. *Id*. at 252-54. As to the challenge to the substantive reasonableness of Petitioner's sentence, the Sixth Circuit found that the district court properly considered the relevant § 3553(a) factors, including Petitioner's circumstances under which he grew up, his egregious criminal history, and his treatment of Victim A, and concluded that, given that the sentence was not arbitrary and was imposed in light of a reasoned application of the § 3553(a) factors, the District Court did not abuse its discretion. *Id*. at 255.

On November 2, 2018, Petitioner filed his *pro se* motion to vacate along with a supplemental memorandum before the undersigned. (Case No. 3:18-cv-01232, Doc. Nos. 1-2.) The Government filed its response on December 14, 2018. (Doc. No. 5.) Thereafter, the Court granted Petitioner's request for time to file "a supporting brief and supporting memorandum of law," on or before March 16, 2019. (Doc. No. 7.) On August 16, 2019, Petitioner filed a reply to the Government's response. (Doc. No. 10.) On October 22, 2019, the Court granted Petitioner a second extension of time to file a supporting brief to his motion to vacate, giving him 45 days to do so. (Doc. No. 12.) The Court warned no further briefing would be authorized. (*Id*.) On December 13, 2019, Petitioner filed his memorandum in support of his motion to vacate, along with a motion to file an affidavit. (Doc. Nos. 13-14.)

Petitioner asserts that he was denied effective assistance of counsel due to (1) counsel's failure to file a motion to suppress Petitioner's inculpatory statements regarding alleged past conduct, referred to as his "life story," to law enforcement officers, as the statements were uncorroborated and made when he was allegedly under the influence of intoxicants and without prior Mirandization; (2) counsel's failure to object to the "life story" statements included in the PSR; (3) counsel's failure to argue that Petitioner was actually innocent of the conduct purported in the

"life story" used at time of sentencing, including by failing to "object [to], suppress, or argue [against]" the statements on the grounds that they violated Petitioner's constitutional right to "being presumed innocent;" (4) counsel's failure to negotiate for or secure a Rule 11(c)(1)(C) plea agreement that would have "precluded or, at least, minimized the use of the 'life story' at sentencing;" (5) counsel's failure "to adequately object under *Bostic*" to Petitioner's sentence, as counsel was required to object with a "reasonable degree of specificity" to allow for meaningful appellate review; and (6) counsel's failure to "appeal adequately," as counsel did not "adequately describe what the procedural and substantive due process issues were." (Doc. No. 2 at 2-5.)

## LEGAL STANDARD

To prevail on a § 2255 motion, a petitioner must demonstrate that the court imposed the sentence in violation of the Constitution, the court was without jurisdiction to impose such a sentence, the sentence was more than the maximum sentence authorized by law, or the sentence is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255 (2018). Section 2255 requires "a hearing on such allegations unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (internal quotation marks omitted); *Ray v. United States*, 721 F.3d 758, 760-61 (6th Cir. 2013); *see also Dagdag v. United States*, No. 3:16-cv-364-TAV, 2019 WL 2330274, at *1 n.1 (E.D. Tenn. May 31, 2019) (internal quotation marks omitted) (citing *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)) ("[W]here the record conclusively shows that the petitioner is entitled to no relief, a hearing is not required.").

A petitioner is not entitled to an evidentiary hearing if he has not alleged any facts that, if true, would entitle the petitioner to federal habeas relief. *See McSwain v. Davis*, 287 F. App'x 450, 458 (6th Cir. 2008). Even when material facts are in dispute, an evidentiary hearing is unnecessary

if the petitioner is conclusively entitled to no relief. *See Amr v. United States*, 280 F. App'x. 480, 485 (6th Cir. 2008). "Stated another way, the court is not required to hold an evidentiary hearing if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.; accord Arredondo*, 178 F.3d at 782. The decision whether to hold an evidentiary hearing is one committed to the sound discretion of the district court. *Huff v. United States*, 734 F.3d 600, 607 (6th Cir. 2013) ("A decision not to hold an evidentiary hearing on a motion for relief under 28 U.S.C. § 2255 is reviewed for abuse of discretion.").

The applicable rules address what the district court may (and must) consider in determining whether to order an evidentiary hearing, where (as here) the motion is not dismissed under Rule 4(b) based on the district court's initial review:

> If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

Rule 8(a), Rules Governing Section 2255 Proceedings. As suggested, Rule 7 permits expansion of the record with additional materials relevant to the motion, such as letters predating the filing of the motion, documents, exhibits, answers under oath to interrogatories, and affidavits. Rule 7(b), Rules Governing Section 2255 Proceedings.

Having carefully reviewed the record in Petitioner's underlying criminal action, as well as the filings in this action, the Court finds that there are no evidentiary issues to be resolved and that it is unnecessary to hold an evidentiary hearing to resolve Petitioner's claims. Therefore, the Court will dispose of the motion without a hearing, as the record conclusively establishes that Petitioner

is not entitled to relief on his claims for the reasons set forth herein.[5]

## DISCUSSION

A defendant has a Sixth Amendment right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "It has long been settled that a guilty plea is open to attack on the ground that counsel did not provide the defendant with reasonably competent advice." *Hunter v. United States*, 160 F.3d 1109, 1115 (6th Cir. 1998) (internal quotation marks omitted). In *Strickland*, the Supreme Court put forth a test to evaluate claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that rendered the result unreliable.

*Strickland*, 466 U.S. at 687. Petitioner bears the burden of proving by a preponderance of the evidence that counsel was deficient. *See Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (citing *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006)).

Under the first prong of the *Strickland* test, a petitioner must establish that his attorney's representation fell below an objective standard of reasonableness. 466 U.S. at 688. However, "[j]udicial scrutiny of counsel's performance must be highly deferential," and must avoid the "second-guess[ing of] counsel's assistance after conviction or adverse sentence, . . . [ as] it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

---

[5]The Government concedes that Petitioner's motion is timely. (Doc. No. 5 at 17-18.)

particular act or omission of counsel was unreasonable." *Id.* at 689. Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . . " *Id.* at 689. Strategic choices made by counsel after thorough investigation are virtually unchallengeable. *Id.* at 690. Courts must "assess counsel's performance based on 'counsel's perspective at the time,' 'considering all the circumstances,' rather than 'in the harsh light of hindsight.'" *Snider v. United States*, 908 F.3d 183, 192 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1573 (2019) (citations omitted).

The second prong of the *Strickland* test requires a petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

The two-part *Strickland* test also "applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). The performance prong is still the same, that is, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (citations and internal quotation marks omitted). Under the prejudice prong in the plea context, a petitioner must demonstrate with "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Alternatively, a petitioner may establish prejudice by showing that had he been properly advised by counsel during the plea process, he "would have bargained for a more favorable plea." *Rodriguez-Penton v. United States*, 905 F.3d 481, 488 (6th Cir. 2018).

A. CLAIMS ONE THROUGH THREE

Petitioner's first three arguments for vacatur of his sentence overlap and are essentially that

his counsel failed to prevent the use at sentencing of the statements that formed the bases of his "life story." Petitioner argues that his counsel failed to move to suppress and object to these statements on the grounds that the statements were uncorroborated, made when he was allegedly under the influence of intoxicants, and made without prior receipt of his *Miranda* warnings. At the plea hearing, Agent Fagan testified that after Petitioner's arrest on October 4, 2014, Petitioner was advised of his *Miranda* rights, and following Agent Fagan's testimony, Petitioner admitted to the truth of the facts as described by Agent Fagan.

In his supplemental memorandum in support of his motion to vacate, Petitioner makes an attempt to get around these inconvenient facts. Specifically, he essentially asserts that his receipt of *Miranda* warnings did not count, and that his waiver of *Miranda* rights was involuntary and thus invalid, because "[a]t no time was [he] advised of his rights after he was no longer intoxicated, but only prior to his statements while still under the influence." (Doc. No. 14 at 4.) However, this assertion is merely a conclusory statement and is not supported by any evidence in the record. There is no mention of any drug or alcohol use by Petitioner during the time period he committed his crimes in the recitation of facts in the PSR or at the time of his guilty plea. Nor does Petitioner even allege what "intoxicant" he was using.

In any event, Petitioner voluntarily dictated his "life story" and the three letters to Victim A, who provided these statements to law enforcement; he also told Victim A that he had sexually abused his daughter; all of these statements of Petitioner (hereinafter, "Petitioner's incriminating statements to Victim A") were consistent with the statements he later made to law enforcement four days after his arrest). Notably, Victim A was not a law enforcement employee or informant. Thus, her statements were not generated as the result of police interrogation and were available to the

Court regardless of the similar statements Petitioner made to law enforcement. As Petitioner's incriminating statements to Victim A were obtained independently of custodial interrogation, they were admissible even if Petitioner's subsequent statements to police on the same topics were suppressible (which, as noted, they in fact are not). The dreadful alleged facts from Petitioner's life thus were properly before the Court before the sentencing, based on Petitioner's pre-arrest incriminating statements (including by dictation) to Victim A. In fact, Petitioner's incriminating statements to Victim A are laid out in full in the PSR (PSR ¶¶ 14-15).[6] Thus, it would have made no difference had Petitioner's "life story" statements to the police been suppressed. Accordingly, Petitioner suffered no prejudice, as required for relief under *Strickland*, from the alleged error of his counsel in failing to obtain suppression of those statements. Moreover, "a district court may consider improperly seized evidence, though inadmissible at trial, to enhance a defendant's sentence, so long as the evidence was not seized for the purpose of enhancing the defendant's sentence." *United States v. Carmack*, 426 F. App'x 378, 383 (6th Cir. 2011) (citing *United States v. Jenkins*, 4 F.3d 1338, 1344-45, (6th Cir. 1993)); *Croft v. United States*, No. 13-CR-20568, 2019 WL 560254, at *4 (E.D. Mich. Feb. 12, 2019).

Petitioner's contentions that his counsel failed to object to the "life story" statements included in the PSR and failed to argue that Petitioner was actually innocent of the conduct in his "life story" are equally without merit. The record shows that Petitioner's counsel filed two memoranda and argued at the sentencing hearing that Petitioner's "life story" statements, regarding

---

[6] To the extent that the information contained in in Petitioner's incriminating statements to Victim A is the same as Petitioner's October 8 statements to police, its admissibility is additionally ensured (irrespective of any Fifth Amendment violation in obtaining the October 8 statements) by the independent source doctrine. Under that doctrine, evidence is admissible if the government can show that it was discovered through sources "wholly independent of any constitutional violation." *Nix v. Williams,* 467 U.S. 431 442-43 (1984). The doctrine is intended to ensure that the government is not penalized for wrongdoing that would not affect the outcome of the case. "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source," *i.e.,* one unrelated to and independent of the unconstitutional search. *Murray v. United States,* 487 U.S. 533, 538-39 (1988) (internal quotation marks and citation omitted).

any uncharged sex offenses, were not supported by detailed, dated, or reliable evidence and therefore could not support an upward departure. Petitioner's counsel also asserted that the bulk of the prior uncharged sexual misconduct occurred when Petitioner was a juvenile and, thus, should not be considered. As stated previously, Victim A's transcription of Petitioner's life story and three letters was consistent with the statements that Petitioner gave to officers on October 8, 2014. Petitioner took advantage of his opportunity to be heard at sentencing, but despite making various remarks, he did not object to or dispute any of the statements in his "life story."

Accordingly, these claims are without merit.

B. <u>CLAIM FOUR</u>

Petitioner asserts that his counsel was ineffective for failing to obtain an 11(c)(1)(C) plea agreement. Petitioner alleges that the use of the "life story" was "the judicial reasoning behind what would have been a 324 month sentence" and that he pled guilty "after being told he would receive that 324 month sentence," based upon being sentenced to 240 months on Count One, with such sentence to run concurrently with Counts Two and Three, and a sentence of 84 months on Count Four, but instead the Government moved for a life sentence, which resulted in him receiving a 564-month sentence. (Doc. No. 2 at 3-4.) Petitioner further asserts that his counsel did not "attempt to secure a plea limiting [his] exposure at sentencing" and that "[o]ne can't know if a plea under Rule 11(c)(1)(C) would have been secured," but that his counsel "did not try." (Doc. No. 14 at 5.)

As an initial matter, the record contradicts Petitioner's allegation that he pled guilty "*after* being told he would receive *that* 324 month sentence." There is no indication anywhere in the record that a 324-month sentence was specifically contemplated by anyone at the time of his guilty plea.

Instead, at the time of his plea, as reflected below and as quoted above, the Court informed Petitioner that his sentence would not be determined until the PSR was completed. Following Petitioner's guilty plea, the Probation Office later calculated Petitioner's baseline sentencing range to be 252 to 294 months of imprisonment, but then recommended an upward adjustment to a 324- month sentence—the first time the record reflects in any way that a 324-month sentence was potentially in the offing. And the record reflects that a 324-month sentence is not what the defense had in mind; Petitioner's counsel subsequently filed a sentencing memorandum, in which he "vehemently" objected to the recommended 324-month sentence and requested a sentence of 264 months of imprisonment.

In any event, the Sixth Circuit has held that "'[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel.'" *Mix v. Robinson*, 64 F. App'x 952, 956-57 (6th Cir. 2003) (citation omitted); *accord United States v. Monroe*, No. 1:18 CR 00126, 2020 WL 589044, at *3 (N.D. Ohio Feb. 5, 2020); *see also Ewing v. United States*, 651 F. App'x 405, 410 (6th Cir. 2016) (rejecting ineffectiveness of counsel claim where counsel promised defendant he would receive 144 months when the plea colloquy made clear "that [defendant] was fully aware that no particular sentence was being promised when he entered the guilty plea and that the district judge, and no one else, would determine the final sentence."). The Sixth Circuit has also recently stated:

> When an ineffective-assistance claim is based on misleading information regarding the consequences of a plea, a proper plea colloquy is generally deemed to cure any misunderstanding the defendant may have had about the consequences of the plea. *Ewing v. United States*, 651 F. App'x 405, 410 (6th Cir. 2016) (citing *Ramos v. Rogers*, 170 F.3d 560, 565 (6th Cir. 1999)). The court's proper advisement of rights is thus deemed to "foreclose" any showing of actual prejudice attributed to counsel's erroneous advice, because the defendant is deemed bound by his statements in response to the court's inquiry. *Id.* Otherwise, the plea colloquy process would be rendered meaningless if a defendant could reopen the record by later asserting that

actually, he misunderstood. *Ramos*, 170 F.3d at 566.

*United States v. Pola*, 703 F. App'x 414, 423 (6th Cir. 2017).

Here, the plea hearing colloquy reflects that the Court advised Petitioner and Petitioner stated under oath that he understood: the statutory maximum penalties on each count of the indictment; that Petitioner's sentence would ultimately be determined by a combination of the advisory sentencing guidelines and any possible authorized departures or variances from those guidelines after weighing the statutory factors; that the Court would not be able to determine Petitioner's advisory guideline range until the PSR was completed and his counsel had a chance to object to any parts of the PSR; that the Court was authorized to depart and vary upward or downward from the guideline range; that Petitioner's sentence could ultimately be higher or lower than the guideline sentence or any sentence that he and his counsel may have discussed; and that any possible sentence that Petitioner may have discussed with his counsel or with the Government were only predictions or estimates and not guarantees of anything. Petitioner also stated that no one had made him any promises to get him to plead guilty and that he was satisfied with his counsel's representation. Accordingly, the Court's "proper plea colloquy cured any misunderstanding [Petitioner] may have had about the consequences of his plea." *Ewing*, 651 F. App'x at 410 (citing *Ramos*, 170 F.3d at 565 ("the trial court's 'clear and thorough plea allocution' apprising the defendant of the 'actual sentencing possibilities' prevented the defendant from showing actual prejudice under *Strickland*.")) (citation omitted); *Baker v. United States*, 781 F.2d 85, 92 (6th Cir. 1986) ("'[c]ourts naturally look with a jaundiced eye upon any defendant who seeks to withdraw a guilty plea after sentencing on the ground that he expected a lighter sentence.'") (citation omitted); *United States v. Huguely*, No. 5:12-CR-4-JMH-2, 2016 WL 8255011, at *4 (E.D. Ky. Aug. 3, 2016), *report and recommendation adopted*, No. CV512CR00004JMHEBA2, 2017 WL 603177 (E.D. Ky. Feb. 14, 2017) ("[E]ven

assuming his counsel had persuaded him otherwise, it was incumbent upon Defendant to reveal to the Court when questioned if his counsel had made promises to him about a particular sentence.").

As to Petitioner's allegation that his counsel failed to attempt to obtain a Rule 11(c)(1)(C) plea agreement, Petitioner does not allege that the Government made any plea offers, let alone, one under Rule 11(c)(1)(C).[7] Nor does he present any specific factual allegations regarding any alleged plea discussions between him and his counsel or with the Government. Petitioner cites to nothing in the record that an 11(c)(1)(C) plea agreement was, or would have been, offered in Petitioner's criminal action. Moreover, Petitioner does not assert that but for the alleged errors of counsel, he would not have pled guilty and would have proceeded to trial. *See United States v. Boshears*, No. CIV 14-7331-GFVT-CJS, 2015 WL 1059323, at *12 (E.D. Ky. Mar. 10, 2015) ("Here, Defendant has failed to establish the prejudice prong for any of his ineffective assistance of counsel claims because he has not asserted in his Motion that but for the alleged errors of counsel, he would not have pled guilty."). Petitioner just complains that his counsel was unable to obtain a plea agreement under Rule 11(c)(1)(C), but Petitioner had no right to such an offer. "[I]f the Government exercises its discretion not to bargain for a guilty plea, no constitutional question is presented." *Rodriguez-Penton*, 905 F.3d at 489. Thus, "because there is no right to a plea offer, where a petitioner alleges ineffective assistance of counsel prevented plea negotiations, demonstrating prejudice requires that

_____

[7]Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure provides, in part, as follows:

> . . . . If the defendant pleads guilty . . . to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:

. . .

> > (C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

Fed. R. Crim. P. 11(c)(1)(C).

he establish a reasonable probability that but for counsel's errors, the petitioner would have received a plea offer." *Byrd v. Skipper*, 940 F.3d 248, 257 (6th Cir. 2019). Further "a petitioner must also show that he would have accepted the offer, the prosecution would not have rescinded the offer, and that the trial court would not have rejected the plea agreement." *Id.*

Here, there is no showing or allegation that the Government was interested in offering Petitioner a plea deal under Rule 11(c)(1)(C). In fact, Petitioner alleges no facts that would suggest that his counsel could have successfully negotiated a plea agreement. Given the egregious facts in this case, this is not surprising. The Government would certainly have been aware of Petitioner's "life story," and the fact that the Government sought a life sentence for Petitioner discredits Petitioner's claim that his counsel was ineffective in failing to obtain a plea agreement under Rule 11(c)(1)(C).

Accordingly, Petitioner's contentions are without merit.

C. CLAIMS FIVE AND SIX

Petitioner's claims in five and six overlap and will be discussed together. Petitioner argues that at time of his sentencing, his counsel failed to object, with a "reasonable degree of specificity," to allow appellate review of the following contentions: (1) that the two-day notice that the Government provided stating that it was seeking a life sentence provided insufficient time to prepare for sentencing; (2) that because Petitioner had only one criminal point, Petitioner's criminal history category should have been I, instead of IV as found by the Court; and (3) that Petitioner's base offense level was incorrect. (Doc. No. 2 at 4.) Petitioner also argues that his counsel was ineffective on appeal because counsel did not adequately describe the pertinent procedural and substantive due process issues. *Id.* at 5.

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *Kelly v. United States*, No. 16-6756, 2017 WL 6048864, at *2 (6th Cir. July 5, 2017). Although the Sixth Circuit noted that Petitioner's counsel's objection to the upward departure imposed at time of sentencing was "vague," the Sixth Circuit addressed, under plain-error standard of review,[8] the procedural reasonableness of Petitioner's sentence and found no plain error occurred. *Davis*, 702 F. App'x 251-54.[9] As this issue was addressed on direct appeal, Petitioner's attempt to relitigate this issue in his § 2255 motion is foreclosed, and Petitioner cannot establish that he was prejudiced by any failure to object with more specificity. The Sixth Circuit also addressed Petitioner's argument concerning whether the district

[8]Because the Sixth Circuit determined that Petitioner's counsel's objection was not specific enough to have advised the district court that he was objecting to the adequacy of the district court's explanation, the Sixth Circuit reviewed the procedural reasonableness of the sentence under the plain-error standard of review instead of the more forgiving (for the defendant-appellant) abuse-of-discretion standard of review. *Davis*, 702 F. App'x at 250-52. To the extent that Petitioner may suggest that he suffered prejudice from the less favorable standard of appellate review used due to his counsel's failure to object sufficiently at sentencing, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "To establish prejudice in the sentencing context, a petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, he would have received a lower sentence." *Wilder v. United States*, No. 16-4079, 2017 WL 4417859, at *1 (6th Cir. Mar. 23, 2017). In *United States v. Busch*, 411 F. App'x 872 (6th Cir. 2011), where the petitioner suggested that counsel's failure to object at trial subjected him to the more demanding standard of review for plain error that amounted to prejudice, the Court found such a contention "off the mark," explaining that under *Strickland*, courts "determine prejudice by asking whether trial counsel's error undermined confidence in the outcome of the trial, not by asking whether trial counsel's error resulted in an unfavorable standard of review on appeal." *Id.* at 877 n.4; *see Young v. United States*, No. 2:06-CR-20(4), 2014 WL 1491208, at *14 (E.D. Tenn. Apr. 15, 2014), *vacated and remanded on other grounds, see Young v. United States*, No. 206CR20JRGMCLC4, 2016 WL 6592374, at *1 (E.D. Tenn. Nov. 7, 2016), ("Petitioner's suggestion that his attorney's failure to move for a judgment of acquittal subjected him to a more onerous standard of review on direct appeal is beside the point. The issue to be determined is whether counsel's performance was deficient and whether an error on the part of trial counsel 'undermined confidence in the outcome of the trial, not . . . whether trial counsel's error resulted in an unfavorable standard of review on appeal.'" (quoting *Busch*, 411 F. App'x at 876-77)). Here, whatever appellate standard of review was occasioned by the manner in which defense counsel objected, Petitioner fails to show a reasonable probability that, had his counsel objected more specifically to the upward departure, he would have received a lower sentence or changed the district court's analysis of the § 3553(a) factors at sentencing.

[9]"Unlike procedural reasonableness claims, an appeal arguing that a sentence is substantively unreasonable is not subject to plain error review for failure to object at the sentencing hearing." *United States v. Solano-Rosales*, 781 F.3d 345, 355–56 (6th Cir. 2015). Here, applying abuse-of-discretion review, the Sixth Circuit found Petitioner's sentence substantively reasonable. *Davis*, 702 F. App'x at 254-55.

court inadequately considered whether his criminal history category should have been I or IV. The Sixth Circuit found, in essence, that while the district court's consideration of whether to depart upwardly to a criminal history IV was "scant," the district court's explanation was sufficient enough to be reasonable under a plain-error standard of review. *Id*. at 253-54. Again, as this issue was litigated on direct appeal, it may not now be relitigated.

Petitioner makes a vague and conclusory allegation that his base offense level was improperly calculated without any proper argument or evidence in support. Such arguments, lacking supporting analysis, need not be considered. *United States v. Santiago*, 135 F. App'x 816, 823 (6th Cir. 2005); *Spencer v. Booker*, 254 F. App'x 520, 525 (6th Cir. 2007) ("If 'one is left with pure speculation on whether the outcome of . . . the penalty phase could have been any different,' there has been an insufficient showing of prejudice.") (citation omitted). Petitioner presents no more than mere speculation that had his counsel objected to the calculation of his base offense level, he would have received a different sentence. Moreover, as the Court departed upward from the applicable guidelines and imposed the statutory maximum sentences on all but the 924(c) count, Petitioner fails to establish any prejudice relating to any alleged miscalculation.

Finally, while counsel's objection, "based upon notice . . .," may have been vague, Petitioner fails to show that he suffered any prejudice from it. In response to the Government's motion for an upward departure and at the sentencing hearing, Petitioner's counsel argued that Petitioner was not given sufficient notice of an upward departure under Fed. R. Crim. P. 32(h), which provides that a court give reasonable notice to the parties "that it is contemplating" a departure "from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission." Fed. R. Crim. P. 32(h). Rule 32(h) requires reasonable notice only to the extent that a court relies on grounds "not identified . . . in the presentence report or in a party's

prehearing submission." Here, the grounds for an upward departure relied upon by the Court were clearly raised in either the PSR or in the Government's sentencing memorandum (R. 37) requesting an upward departure and/or upward variance. The Government did not rely on any new facts or evidence, but made its request on the same bases as the Probation Office did. At sentencing, the parties discussed a single possible ground for an upward departure—*i.e.,* based on the Petitioner's criminal history category underrepresenting his criminal history—and specifically noted that it was suggested in paragraph 100 of the PSR. (R. 45 at 2, 6). The Court allowed argument from the parties on this issue, then advised the parties that an upward departure was warranted under U.S.S.G. § 4A1.3 based on the underrepresentation of Petitioner's criminal history and the likelihood that the defendant will commit other crimes. (*Id.* at 16). As Petitioner was aware of the facts in the PSR and the bases for the Probation Office's recommendation for an upward departure on this particular basis, as well as the Government's request for a life sentence based upon the same facts, Petitioner fails to show that there was a violation of Rule 32(h). *See United States v. Bunkley*, 732 F. App'x 388, 392 (6th Cir. 2018) ("So the only way [defendant] can obtain relief is by showing that the district court's discussion of these facts 'came as a surprise' and prejudiced his presentation to the district court."); *United States v. Meeker*, 411 F.3d 736, 744 (6th Cir. 2005) ("[I]f cumulative evidence otherwise exists in the record, then the defendant is already on notice and less preparation time is necessary."); U*nited States v. Rossi*, 422 F. App'x 425, 431 (6th Cir. 2011) ("Rule 32(h) do[es] not require pre-hearing notice. 'Only "reasonable notice" is required, and what constitutes reasonable notice will vary depending on the circumstances of the particular case.'") (citations omitted); *see also United States v. Springer*, 300 F. App'x 339, 342 (6th Cir.2008) (finding that the court satisfied Rule 32(h) where it advised the defendant with particularity of the reasons it was considering an upward departure and gave defense counsel an opportunity to respond to the government's request, and stating that Rule 32(h)

did not require notice be given prior to the day of sentencing and in writing, only that "reasonable notice" be given.); *United States v. Barnett*, 460 F. App'x 582, 585, 589 (6th Cir. 2012) (where the government filed its motion for upward departure or upward variance a day before sentencing, the Court found that "even if some aspect of the upward deviation was a 'departure' entitling [defendant] to notice under Rule 32(h), he received such notice by virtue of the Government's pre-sentencing motion for an upward departure/variance."). Moreover, there is nothing in the record that suggests, nor does Petitioner suggest, what Petitioner's counsel could have done to prepare better had he been given more notice.

Likewise, to the extent that Petitioner's sentence resulted from an upward variance as well as an upward departure, the variance did not result from any facts not included in the PSR or from any identifiable lack of preparation. And in any event, the notice requirement prescribed by Rule 32(h) does not apply to a variance from a recommended Guidelines range. *See Irizarry v. United States*, 553 U.S. 708 (2008); *Barnett*, 460 F. App'x at 589 ("According to the Supreme Court, Rule 32(h)'s notice requirement applies to Guidelines-based departures but not to variances under § 3553(a)." (quoting *Irizarry*, 553 U.S. at 714-716)).

Accordingly, for the reasons stated above, Petitioner's claims are without merit.

## CONCLUSION

For the reasons stated herein, Petitioner's § 2255 Motion to Vacate, Set Aside, or Correct Sentence in accordance with 28 U.S.C. § 2255 will be **DENIED** without need of an evidentiary hearing, and this action will be **DISMISSED**.

An appropriate order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE